Argued and submitted November 4, 2002, decision of the Court of Appeals
reversed; judgment of the circuit court affirmed January 23, reconsideration
denied March 23, 2004

OREGON STEEL MILLS, INC.,
a Delaware corporation,
*Respondent on Review,*

*v.*

COOPERS & LYBRAND, LLP,
a Delaware limited liability partnership,
*Petitioner on Review.*

(CC 9708-06108; CA A107366; SC S48978)

83 P3d 322

Michael L. Rugen, of Heller Ehrman White & McAuliffe, LLP, San Francisco, California, argued the cause and filed the brief for petitioner on review. With him on the brief were Natalie L. Hocken, Evan L. Schwab, and Rita V. Latsinova.

Lynn R. Nakamoto, of Markowitz Herbold Glade & Mehlhaf, P.C., Portland, argued the cause and filed the brief for respondent on review. With her on the brief was Peter H. Glade.

David F. Rees, of Stoll Stoll Berne Lokting & Schlachter, P.C., Portland, filed a brief on behalf of *amicus curiae* Oregon

Trial Lawyers Association. With him on the brief was Gary M. Berne.

Before Carson, Chief Justice, and Gillette, Durham, Riggs, De Muniz, and Balmer, Justices.**

BALMER, J.

---

** Leeson, J., resigned January 31, 2003, and did not participate in the decision of this case. Kistler, J., did not participate in the consideration or decision of this case.

BALMER, J.

This case requires us to consider once again difficult issues of causation and foreseeability in tort law. We are asked to decide whether defendant, an accounting firm, may be held liable for damages suffered by plaintiff, its client, due to changes in the market price of plaintiff's stock that defendant's negligent conduct did not cause. The trial court granted defendant's motion for summary judgment, and the Court of Appeals reversed. *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 176 Or App 317, 31 P3d 1092 (2001). We allowed review and, for the reasons that follow, reverse the decision of the Court of Appeals and affirm the judgment of the trial court.

## I. FACTS

We take the following facts from the summary judgment record, viewing the facts and all reasonable inferences that may be drawn from them in the light most favorable to plaintiff, as the nonmoving party. *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997). Plaintiff Oregon Steel Mills, Inc., a company whose stock is traded on the New York Stock Exchange, retained defendant Coopers & Lybrand, LLP, for many years to provide accounting and auditing services. In 1994, plaintiff entered into a transaction that involved the sale of stock in one of plaintiff's subsidiaries. Defendant advised plaintiff that the transaction should be reported as a $12.3 million gain on plaintiff's financial statements and reports. Pursuant to that advice, plaintiff reported the transaction as a gain and, when defendant audited plaintiff's 1994 financial statements in early 1995, defendant gave its opinion that plaintiff's consolidated financial statements fairly represented plaintiff's financial position in accordance with generally accepted accounting principles. Plaintiff alleges in its complaint, and for purposes of its summary judgment motion defendant does not dispute, that defendant's accounting advice regarding the 1994 transaction was incorrect and that defendant gave that advice negligently.

During late 1995 and early 1996, plaintiff was planning to make a public offering of its stock and debt. Defendant knew of plaintiff's plans and had known, since at least 1994, that plaintiff would be selling stock and debt at some time in the future. Plaintiff anticipated that it would file the necessary documents with the Securities and Exchange Commission (SEC) on February 27, 1996, and that, barring unforeseen problems in the SEC approval process, the securities would be priced and sold on or about May 2, 1996. Defendant provided accounting advice to plaintiff in connection with the planned offering, and the documents that plaintiff filed with the SEC included the 1994 financial statements that defendant had audited.

Shortly before the initial SEC filing, defendant advised plaintiff that the 1994 transaction might have been reported incorrectly and that defendant would not approve the audit of plaintiff's 1995 financial statements or allow use of the 1994 audit unless the SEC approved the accounting treatment of the 1994 transaction. Subsequently, the SEC concluded that the accounting treatment for the 1994 transaction was incorrect and required plaintiff to restate its 1994 financial statements. Because of the time required to restate the 1994 financial statements and change other documents related to the planned offering, plaintiff was unable to make its initial filing with the SEC until April 8, 1996, and the public offering did not occur until June 13, 1996. On that date, plaintiff sold $80 million of newly issued stock and $235 million of debt. Although the price of plaintiff's stock was $13.50 on February 22, 1996, when defendant discovered the accounting error, and, coincidentally, also was $13.50 when plaintiff issued the stock on June 13, 1996, the stock price had risen and fallen between those dates. On May 2, 1996, the date that plaintiff alleges that it would have issued the stock but for defendant's negligence, plaintiff's stock sold for $16 per share.

## II.   PROCEEDINGS BELOW

Plaintiff brought this action in 1997, claiming that defendant's negligent conduct caused the delay that resulted in the stock being offered at $13.50 per share, rather than at

$16 per share.[1] Plaintiff therefore seeks as damages from defendant the difference between what plaintiff actually received for its stock and debt and what it alleges that it would have received if the securities offering had occurred on May 2, 1996, an amount plaintiff asserts to be approximately $35 million.[2]

As noted above, defendant moved for summary judgment. Defendant argued tnat, even if its negligent conduct had caused the delay in plaintiff's offering, defendant could not be liable for any "loss" resulting from plaintiff's stock being sold at $13.50 per share rather than at $16 per share because that "loss" was due to market factors unrelated to defendant's negligent conduct. The material facts underlying defendant's summary judgment motion are undisputed. Both parties agree on the historical facts summarized above and, in particular, that, but for defendant's negligent conduct, plaintiff would have sold its securities at an earlier date and at more favorable prices. It also is undisputed that the increase in the market price of plaintiff's stock in late April 1996 and its decrease in early June 1996 were unrelated to defendant's conduct and instead resulted from market forces affecting all steel stocks.

Based on those facts, defendant argued in the trial court that, as a matter of law, its negligent conduct was not the legal cause of plaintiff's "loss." Defendant relied on cases holding that a plaintiff cannot recover losses resulting from market fluctuations unless the defendant's misconduct caused the change in the market price. That concept, sometimes labeled "loss causation," requires that a plaintiff prove not only that its loss would not have occurred "but for" a defendant's negligent conduct, but also that defendant's negligence itself had some impact on the market price. *See*

---

[1] Plaintiff's complaint also alleged that plaintiff was damaged because the delay caused the debt component of the offering to be sold at a higher interest rate. The applicable interest rate was higher on June 13, 1996, than it had been on May 2, 1996. The parties' arguments about whether defendant can be held liable for the "loss" due to the lower stock price apply equally to any "loss" due to the higher interest rate, as does our analysis of those arguments.

[2] Plaintiff's second amended complaint also claimed damages for "extra expenses incurred as a direct result of the delay in the offering"—presumably including legal, accounting, and related costs. In the trial court, however, plaintiff waived its claim for those "out-of-pocket" expenses.

*Movitz v. First Nat'l Bank*, 148 F3d 760 (7th Cir 1998), *cert den*, 525 US 1094 (1999) (where real estate investor purchased building in reliance on bank's negligent evaluation of building, investor could not recover from bank for damages attributable to collapse of real estate market because bank's conduct did not cause market collapse).

Defendant also argued that its liability was limited to the reasonably foreseeable consequences of its actions, citing *Buchler v. Oregon Corrections Div.*, 316 Or 499, 853 P2d 798 (1993). Defendant asserted that the June 1996 decline in steel company stock prices, including plaintiff's stock price, which resulted in plaintiff raising less money from its securities offering than it would have raised absent the decline, was not a "reasonably foreseeable" consequence of defendant's accounting errors in 1994.[3] Defendant distinguished cases in which courts have held defendants liable for losses due to market fluctuations, arguing that those cases involved situations in which the defendant had a specific legal duty to maximize a plaintiff's stock market return.[4] In this case, defendant argued, its role as plaintiff's accountant involved no such duty.

In response, plaintiff argued that it was not required to show that defendant's negligent conduct "actually caused the market downturn." Plaintiff had a "professional relationship" with defendant and, plaintiff asserted, if the other elements of a negligence claim could be proved, then "causation" was a jury question that would turn on whether defendant's conduct was a "substantial factor" in producing the damage to plaintiff. Because this was a professional malpractice case, plaintiff argued, the issue was not whether plaintiff's damage was the foreseeable result of defendant's negligent conduct,

---

[3] Defendant noted that its "unforeseeability" argument was similar to the argument that defendant's negligent conduct was not the "proximate cause" of plaintiff's harm, but acknowledged that, under Oregon tort law, the concept of proximate cause is subsumed within the notion of foreseeability. *See Buchler*, 316 Or at 509 n 6 ("In *Stewart v. Jefferson Plywood Co.*, 255 Or 603, 606, 469 P2d 783 (1970), the court erased 'proximate cause' from the lexicon in favor of 'foreseeability.' ").

[4] Defendant cited, *inter alia*, *Carich v. James River Corp.*, 958 F2d 861 (9th Cir 1992) (employee benefits administrator had duty to maximize return on stock sales on behalf of investor) and *Flickinger v. Brown & Co.*, 789 F Supp 616 (WDNY 1992) (stock broker had duty to maximize return to client).

but whether defendant's breach of its duty to plaintiff *caused* plaintiff's damage. Plaintiff also argued that, even if the appropriate analysis was whether a loss due to market fluctuations was "foreseeable," such a loss clearly was "foreseeable" because it is common knowledge that stock prices fluctuate.

The trial court agreed with defendant that plaintiff could not recover for losses based on the decline in the market price of plaintiff's stock because that decline was unrelated to defendant's negligent acts. In its letter opinion, the trial court stated:

"Every public stock issue involves the inherent risk of market fluctuations affecting the securities price at the time of issue. Plaintiff's theory would shift the risk of that fluctuation to the professionals assisting in the offering wherever negligence of the professional caused a delay in the sale, even though market factors wholly unrelated to the professional negligence were the sole cause of the drop in the issuing price. At the same time, the benefit of any market increase occurring during the delay would inure to the benefit of the issuing business.

"It is reasonably foreseeable that bad accounting practices may cause the client harm in a myriad of ways. For a large publicly owned corporation such as [plaintiff], one of those anticipated harms would be an impairment of the client's ability to raise capital. From an impaired ability to raise capital, there then can flow a myriad of damaging consequences, including business failure, lost opportunity, and lost profits. All these damages are reasonably foreseeable consequences of an impaired ability to raise capital, and are recoverable if proven with the requisite degree of certainty. While [plaintiff] was at risk of suffering this type of damage, it did not suffer, or in any event it is not seeking recovery for, this type of damage.

"Here, the alleged damaging consequence is a decline in market value during the delay in getting the security issue to market. While [defendant's] accounting errors caused [plaintiff's] delay in getting the security issue to market, these errors had nothing to do with the decline of the price of [plaintiff's] stock and the rise in interest rates."

The trial court thus recognized that defendant's accounting errors "caused" plaintiff's harm in the sense that the harm would not have occurred "but for" those errors, but concluded that, because unrelated market factors caused the decline in the price, plaintiff could not hold defendant liable for plaintiff's losses.

Plaintiff appealed, and the Court of Appeals reversed the trial court's summary judgment.[5] The Court of Appeals agreed with plaintiff's causation argument: that whether "defendant's negligence was the *cause* of plaintiff's damages presents a triable question for the factfinder." 176 Or App at 322 (emphasis added). The Court of Appeals reached that conclusion by first considering the loss causation cases relied on by defendant and the trial court. It summarized that doctrine as providing that "a defendant's liability does not extend to losses that are caused by fluctuations in market value other than directly by the defendant's wrongful conduct." *Id.* at 320. The court stated that the "apparent premise of the doctrine is that the defendant's conduct is not the efficient cause of ancillary losses resulting from fortuitous movement of the market." *Id.*

The Court of Appeals suggested, however, that the "better-reasoned" federal cases would not preclude the recovery of damages based on market fluctuations from a defendant whose negligent conduct prevents the plaintiff from entering or exiting the market at a planned and foreseeably favorable time. As an example, the Court of Appeals stated that "a broker who forgets and fails to execute a customer's sell order the day before the bottom falls out of the market would not be insulated" from liability for the customer's losses resulting from the market drop. *Id.* at 321.

The Court of Appeals, however, found it unnecessary to rely on any differences between the loss causation doctrine and Oregon tort law "because the allegations here are to the effect that plaintiff's damage was *foreseeably caused* by

---

[5] The trial court also granted defendant's separate motion for summary judgment against plaintiff's claim for "tax damages" that plaintiff would incur if plaintiff recovered on the other claims in its complaint. The Court of Appeals affirmed the trial court ruling, *Oregon Steel Mills*, 176 Or App at 320, and plaintiff has not raised that issue on review. We, therefore, do not discuss the issue further.

defendant's negligent acts that directly led to plaintiff's inability to enter the market at a planned and more favorable time." *Id.* (Emphasis added.) Hence, according to the Court of Appeals, plaintiff's damages could be recovered under both the loss causation doctrine and general principles of Oregon tort law. The court expanded on its view of the causation requirement in a footnote:

> "[T]he consequence of defendant's alleged malpractice was that plaintiff suffered a delay in the sale of its securities and debt. The consequence of that delay is that plaintiff received less money from the sale than it would have received if the sale had occurred when it would have occurred but for defendant's malpractice. The difference in sales price constitutes damages that plaintiff can recover from defendant, because that difference is the direct consequence of the delay that defendant's alleged malpractice caused. That is consistent with a basic principle of Oregon negligence law, which imposes liability for harm on any person whose negligent conduct was a substantial factor in causing the harm. *See, e.g., Brennen v. City of Eugene,* 285 Or 401, 413, 591 P2d 719 (1979)."

*Id.* at 321 n 2. As noted above, the Court of Appeals concluded that "plaintiff's contention that defendant's negligence was the cause of plaintiff's damages presents a triable question for the factfinder." *Id.* at 322.

### III.  ANALYSIS

On review, defendant argues, as it did in the trial court, that a plaintiff in a professional malpractice case may not recover economic damages that are caused by market forces unrelated to the defendant's wrongful conduct. Defendant asserts that the Court of Appeals erred when it applied the "foreseeability" test of *Fazzolari v. Portland School Dist. No. 1J,* 303 Or 1, 734 P2d 1326 (1987), and held that plaintiff was entitled to a trial to determine whether "plaintiff's damage was foreseeably caused by defendant's negligent acts." *Oregon Steel Mills,* 176 Or App at 321. In defendant's view, the extent of the economic damages for which a defendant may be held liable depends on the relationship between a plaintiff and a defendant. Defendant argues that, because plaintiff did not allege that defendant had any duty to protect

plaintiff from changes in the market price of plaintiff's stock, defendant can be liable to plaintiff for harm resulting from adverse changes in that price only if its wrongful conduct was the cause of those changes.

Plaintiff responds that a defendant in a professional malpractice case "causes" a plaintiff's damages, and is liable for those damages, when the defendant's negligent conduct is a "substantial factor" in causing the damages. According to plaintiff, the fact that the damages occur "within a market and are measured by market price change" does not preclude plaintiff from showing that defendant's misconduct was a substantial factor in causing the damages. Alternatively, plaintiff argues that, if defendant's liability depends on the scope of its duty to plaintiff, the record does not contain sufficient evidence to affirm summary judgment for defendant on that ground.

A. *Causation*

We begin with a discussion of causation, because the trial court based its conclusion that plaintiff's "loss" was not a reasonably foreseeable result of defendant's conduct on the fact that "market factors unrelated to [defendant's] negligence * * * *caused* the offering price to decline" (emphasis added), and the Court of Appeals, in reversing, concluded that a jury should determine whether defendant's negligence "foreseeably caused" plaintiff's loss. 176 Or App at 321-22.

Common-law courts traditionally have required that, to recover damages for a defendant's negligent conduct, a plaintiff must establish both (1) that the defendant's conduct was, as a factual matter subject to pleading and proof, one of the "causes" of the plaintiff's injury (often called "factual causation," "but-for causation," or "cause-in-fact"), and (2) that the defendant's conduct "has been so significant and important a cause [of the plaintiff's injury] that the defendant should be legally responsible" (a concept usually referred to as "proximate" or "legal" cause). W. Page Keeton, *Prosser and Keeton on Torts* 273 (5th ed 1984); *see generally id.* at 263-80 (discussing cause-in-fact and proximate cause). The idea of "proximate cause" has been criticized, both because it so frequently is confused with factual or but-for

causation and because it obscures the actual effect of applying the concept, which is to determine whether a plaintiff will be able to recover from a defendant whose conduct was a cause-in-fact of the plaintiff's harm. *Id.* at 273.

■■ This court has rejected the use of the traditional concept of proximate or legal cause as a means of "express[ing] the limits of the harm for which a negligent defendant would be liable," *Fazzolari*, 303 Or at 11, in favor of subsuming such limits "as part of the definition of negligence," *id.* at 12, *quoting Stewart v. Jefferson Plywood Co.*, 255 Or at 606. A plaintiff, of course, still must prove "factual" or "but-for" causation—that there is a causal link between the defendant's conduct and the plaintiff's harm—but, if the plaintiff proves factual causation, whether the defendant is legally responsible for the plaintiff's harm depends on what constitutes negligence in a particular case.

## B. *Negligence: Foreseeability and Duty of Care*

■ We next consider Oregon law on what constitutes "negligence" in a professional malpractice case such as this one. In *Fazzolari*, this court reviewed its earlier negligence cases and restated the circumstances in which one party can recover damages for harm caused by another:

> "[U]nless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff."

303 Or at 17. Following *Fazzolari*, this court has discussed a defendant's liability for harm that the defendant's conduct causes another in terms of the concept of "reasonable foreseeability," rather than the more traditional "duty of care." A claim for common-law negligence thus includes, among other elements, a foreseeable risk of harm to the plaintiff and conduct by the defendant that is unreasonable in light of that risk. *Solberg v. Johnson*, 306 Or 484, 490, 760 P2d 867 (1988). However, as the passage from *Fazzolari* quoted above

indicates, if the plaintiff invokes a special status, relationship, or standard of conduct, then that relationship may "create," "define," or "limit" the defendant's "duty" to the plaintiff.

■        Duty also becomes an issue when, as here, the plaintiff seeks damages for purely economic losses. "[O]ne ordinarily is not liable for negligently causing a stranger's purely economic loss without injuring his person or property." *Hale v. Groce*, 304 Or 281, 284, 744 P2d 1289 (1987). Instead, the plaintiff is required to allege "[s]ome source of a duty outside the common law of negligence." *Id.* Put another way, liability for purely economic harm "must be predicated on some duty of the negligent actor to the injured party beyond the common law duty to exercise reasonable care to prevent foreseeable harm." *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 159, 843 P2d 890 (1992). In this case, of course, plaintiff seeks damages for purely economic losses, and Oregon law, therefore, required it to allege the existence of such a duty to state a claim for relief. Here, plaintiff did so by alleging a special relationship with defendant.

        Defendant suggests that *Fazzolari* divides the world of torts into two categories: (1) tort claims in which the plaintiff invokes a special relationship, liability depends solely on the scope of the duty associated with that relationship, and the foreseeability standard of *Fazzolari* plays no role; and (2) tort claims in which the plaintiff invokes no special relationship, and the general negligence standard of reasonable foreseeability applies.[6] Our review of the cases does not reveal such a clear division between different types of tort claims and, in any event, this case does not require us to address that issue. Here, as noted, there was a special relationship between defendant and plaintiff that established the *existence* of a duty of care on the part of defendant. However, as discussed below, the *scope* of that particular duty in that particular relationship turns out to be limited to harms to plaintiff that were reasonably foreseeable.

---

[6] Defendant, for example, quotes this court's statement in *Onita Pacific* that, "[f]oreseeability alone is not a sufficient basis to permit the recovery of economic losses on a theory of negligence." 315 Or at 165. That statement is correct, but it does not follow that "foreseeability" is not, at least in some cases, a necessary element of a negligence claim for economic damages.

Even when a special relationship is the basis for the duty of care owed by one person to another, this court has held that, if the special relationship (or status or standard of conduct) does not prescribe a particular scope of duty, then "[c]ommon law principles of reasonable care and foreseeability of harm are relevant." *Cain v. Rijken*, 300 Or 706, 717, 717 P2d 140 (1986) (quoted with approval in *Fazzolari*, 303 Or at 16-17). This court further elucidated the relationship between foreseeability and duty in *Buchler*, in which it held that the state was not liable to persons harmed by an escaped prison inmate, in the absence of allegations that the state knew or should have known that the inmate was likely to cause bodily harm to others. This court stated:

> "Either formulation—duty or foreseeability—is a method of describing how the law limits the circumstances or conditions under which one member of society may expect another to pay for a harm suffered."

316 Or at 509. This court in *Buchler* held that "there [was] a *status* occupied by [the] defendant that raise[d] duties of care." *Id.* at 505 (emphasis in original). On examination, however, this court determined that those duties of care were based on common-law principles and did not provide a separate basis for liability in that case, in part because the harm to plaintiff was not foreseeable:

> "It is not possible for a reasonable person to find from this record that a custodian would have known that this particular prisoner was 'likely to cause bodily harm' of the kind that befell plaintiffs two days after his escape. The tragic death and injuries were not *legally foreseeable* results of this particular prisoner's escape. *They are not risks unreasonably created by that escape, nor did they occur because of violation by defendant of any duty arising out of any special relationship between the plaintiffs and the defendant or defendant's status as the prisoner's jailer.*"

*Id.* at 507 (emphasis added).

■ Thus, under *Fazzolari*, *Cain*, and *Buchler*, when a plaintiff alleges a special relationship as the basis for the defendant's duty, the scope of that duty may be defined or limited by common-law principles such as foreseeability.[7]

_____

[7] We note that, although this court has not had occasion to discuss in depth the role, if any, of foreseeability when a plaintiff asserts a special relationship in

## C. *Application*

■     With that background in mind, we return to defendant's argument that the Court of Appeals erred in reversing the summary judgment and concluding that, because plaintiff alleged that its damage was "foreseeably caused by defendant's negligent acts," a triable issue existed as to whether "defendant's negligence was the cause of plaintiff's damages." *Oregon Steel Mills*, 176 Or App at 321-22. For the reasons that follow, we agree with defendant.

■     Before examining "foreseeability," we digress briefly to discuss the Court of Appeals' analysis of causation. The Court of Appeals stated that plaintiff had to show only that plaintiff's damage was, in fact, "caused" by defendant's negligent acts.[8] In the context of the trial court's opinion and the parties' briefs, that conclusion confused the issues of factual cause and proximate cause that we discussed above.[9] If the Court of Appeals meant that defendant's conduct was a cause-in-fact or a but-for cause of plaintiff's harm, the trial court, as noted, also recognized that fact, and we do as well. If the Court of Appeals meant instead that plaintiff sufficiently had alleged that defendant's conduct was a proximate or legal cause of plaintiff's harm,[10] that conclusion ignores this

seeking damages for purely economic losses, the Court of Appeals has addressed that issue on several occasions. *Roberts v. Fearey*, 162 Or App 546, 549-50, 986 P2d 690 (1999); *Allstate Ins. Co. v. Tenant Screening Services, Inc.*, 140 Or App 41, 47-51, 914 P2d 16 (1996).

   [8] At one point, the Court of Appeals phrased the issue this way:

"If plaintiff proves that defendant acted negligently and that that negligence *caused* a delay in the offering of plaintiff's securities and debt, which caused plaintiff to receive less in sale proceeds than it would have received *but for* the delay, a jury could find that defendant's negligence was a substantial factor in the loss that plaintiff suffered as a result of the delay."

176 Or App at 321 n 2 (emphasis added).

   [9] One source of the Court of Appeals' confusion might be its reliance on *Brennen*, 285 Or at 413, for the proposition that one whose negligent conduct "causes" harm to another is liable for that harm if that conduct was a "substantial factor" in causing the harm. *Oregon Steel Mills*, 176 Or App at 321 n 2. This court previously has cautioned against reliance on *Brennen*. *Fazzolari*, 303 Or at 15. Moreover, *Brennen* is particularly mischievous in this context, because it refers to both "cause-in-fact" and "legally cognizable damage," 285 Or at 405, without explaining the relationship between the two; it incorrectly uses the term "legal causation" when discussing "cause-in-fact," *id.* at 413; and it states that the "substantial factor" test is to be used in determining "legal causation," *id.*, when that standard is more appropriately applied in determining cause-in-fact (*see* Keeton, *Torts* at 278).

   [10] That interpretation is supported by the Court of Appeals' use, at one point, of the term "efficient cause," 176 Or App at 320, a variation of the discredited (in

court's cases, discussed above, rejecting reliance on proximate cause to determine the limits of liability for negligence. In either event, the appropriate focus is not causation: There is sufficient evidence of factual causation, and proximate cause is not a useful inquiry in Oregon tort law. Rather, the critical issue is whether plaintiff's market losses were a reasonably foreseeable result of defendant's wrongful conduct.

Our discussion above of recent Oregon tort cases sets the stage for consideration of that issue. The Court of Appeals concluded that the issue of whether plaintiff's damage was "foreseeably" caused by defendant's negligent acts should be tried to a jury. The problem with that conclusion is that no one could foresee, at the time of defendant's accounting errors in 1994 and early 1995, the risk that plaintiff would suffer a loss because its securities would be sold at market-determined prices on June 13, 1996, rather than on May 2, 1996. Plaintiff argues that it is foreseeable that stock prices will fluctuate, and that is certainly true. It also is foreseeable, as the trial court stated, that negligent conduct by an accounting firm may harm a client by impairing its ability to raise capital. With appropriate proof, the client of a negligent accounting firm may recover damages for lost profits or lost business opportunities that result from the accounting firm's negligent acts. Here, however, plaintiff seeks damages based solely on a decline in the price of plaintiff's stock during the delay that defendant caused in getting the offering to market, yet plaintiff admits that the price decline affected all steel stocks and was unrelated to defendant's misconduct.

Although the context of the alleged negligence was quite different, we see significant parallels between this case and *Buchler*. In that case, this court held, as a matter of law, that a prison escapee's crimes committed two days after his escape were not "reasonably foreseeable" consequences of a prison employee's failure to remove the keys from the prison van in which the inmate escaped. This court noted that "[an]

Oregon) term "proximate cause." *Black's Law Dictionary* 213 (7th ed 1999). As with "proximate cause," caution should be exercised in using that term in discussions of Oregon tort law.

intervening criminal instrumentality caused the harm and created the risk," and although

> "it is generally foreseeable that criminals may commit crimes and that prisoners may escape and engage in criminal activity while at large, that level of foreseeability does not make the criminal's acts the legal responsibility of everyone who may have contributed in some way to the criminal opportunity."

316 Or at 511. Despite the fact that the state employee's action in leaving the keys in the van facilitated "an unintended adverse result, where intervening intentional criminality of another person is the harm-producing force, [the employee's act] does not cause the harm so as to support liability for it." 316 Or at 511-12.

Similarly, in this case, defendant's conduct caused the delay in the offering that led to an "unintended adverse result." However, the intervening action of market forces on the price of plaintiff's stock was the "harm-producing force," and defendant's actions did not "cause" the decline in the stock price so as to support liability for that decline. As a matter of law, the risk of a decline in plaintiff's stock price in June 1996 was not a reasonably foreseeable consequence of defendant's negligent acts in 1994 and early 1995.

That conclusion is similar to the conclusions reached by other courts that have considered whether a client in a professional malpractice action can recover for losses caused by market forces. In *First Federal Savings & Loan Ass'n v. Charter Appraisal*, 247 Conn 597, 724 A2d 497 (1999), a client sued an appraiser for negligently overvaluing a piece of property, which led the client to make a loan secured by the property. The court agreed that the client could recover damages that were directly attributable to the overvaluation, but declined to award damages for the loss suffered by the client as a result of a general decline in real estate prices. Similarly, in *Movitz v. First Nat'l Bank*, 148 F3d 760 (7th Cir 1998), *cert den*, 525 US 1094 (1999), the plaintiff had purchased a commercial property based, in part, on a negligent evaluation by the defendant bank. After a decline in real estate prices, the plaintiff argued that it would not have purchased the property if the defendant had not prepared the faulty evaluation,

and sought damages for the loss it incurred when it sold the property. The court concluded that, even though the plaintiff would not have purchased the property but for the negligent evaluation, the bank could not be held liable for the decline in the market value of the property that its misconduct did not cause. Those cases help explain why plaintiff in this case should be able to recover all the out-of-pocket expenses it incurred because of defendant's accounting errors—and perhaps other identifiable damages—but cannot recover damages measured by the decline in the price of its stock in June 1996.

Plaintiff argues that, even if losses due to market forces are not recoverable from a defendant whose negligent behavior did not cause those losses, the losses in this case were foreseeable because defendant knew that plaintiff intended to enter the market and sell its securities at a specific and favorable time. The Court of Appeals relied on that argument, stating that the offering date was timed to take advantage of higher-than-expected first-quarter earnings and favorable market conditions. 176 Or App at 320. However, the record does not support plaintiff's assertion or the Court of Appeals' statements. First, plaintiff's second amended complaint does not allege that the securities offering was scheduled to occur at a specific, advantageous time. The only negligent acts alleged in the complaint are defendant's improper tax advice in 1994 and its audit and approval of the financial statements for the year ended December 31, 1994. Yet, according to the complaint, plaintiff planned the securities offering "during the later part of 1995 and early 1996." Although defendant knew in 1994 that plaintiff contemplated a public offering at some point, the timing of that offering, at least according to the record here, was known only in the most general sense at the time of defendant's wrongful conduct.

Second, to the extent that plaintiff intended to time its offering to take advantage of a favorable quarterly earnings report, as the Court of Appeals suggested, the delay caused by defendant's conduct did not deprive plaintiff of any advantage from that report because, in fact, plaintiff released the report before the public offering. For plaintiff to have been harmed because the offering was delayed too long after

the release of the favorable earnings report, plaintiff would have to present evidence that defendant knew or should have known that plaintiff's stock would have risen briefly after the release of the earnings report and then *fallen* back to its post-release level. Such a market prediction would be surprising—as well as quite speculative—but, in any event, plaintiff made no such contention in any affidavit, deposition, or document submitted as part of the summary judgment record. Nor does the summary judgment record contain any other suggestion by plaintiff that it expected that market conditions would be favorable at the time the offering was originally planned, why those conditions were favorable, or why conditions would be any less favorable six weeks later. On the contrary, the uncontroverted evidence in the record shows (1) that plaintiff wished to issue its securities as expeditiously as possible because it needed cash to finance a capital improvement program and to remain in compliance with bank covenants,[11] and (2) that the increase and then decrease in steel company stock prices, including plaintiff's, between April and June 1996 was due to market forces unrelated to plaintiff's financial condition or to defendant's conduct.

For the reasons set out above, we agree with the trial court that, as a matter of law, the decline in plaintiff's stock price in June 1996 was not a "reasonably foreseeable" consequence of defendant's accounting errors, and defendant therefore cannot be liable for damages based on that decline.

We return briefly to the role that "duty" plays in this case to determine whether there is any basis for imposing on defendant a standard of conduct *beyond* protecting plaintiff from the reasonably foreseeable consequences of defendant's negligent conduct. Nothing in the complaint or in the summary judgment record indicates that defendant's duty to plaintiff was any broader than to act with reasonable competence in performing the professional services for which it was retained. Plaintiff asserted the "special relationship" of accountant and client, and defendant admitted that it was negligent in performing its work as plaintiff's accountant, but nothing in the record suggests that the relationship between

---

[11] Plaintiff did not seek damages for any harm that the delay in its offering caused to its capital improvement program or to its relationship with its banks.

348

the parties imposed a duty on defendant to protect plaintiff from market losses.

For the reasons discussed above, we conclude that, although defendant breached its duty to plaintiff by failing to provide competent accounting services, defendant had no duty to protect plaintiff against market fluctuations in plaintiff's stock price. The decline in plaintiff's stock price in June 1996 was, as a matter of law, not reasonably foreseeable, and defendant cannot be liable for damages based on that decline.[12] The trial court correctly granted defendant's motion for summary judgment on that ground.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

---

[12] For those reasons, we disagree with the Court of Appeals' stock broker analogy, summarized above at 336 Or at 337. That court supported its conclusion that defendant can be liable for plaintiff's market losses because "a broker who forgets and fails to execute a customer's sell order the day before the bottom falls out of the market would not be insulated" from recovery for the customer's losses resulting from the market drop. 176 Or App at 321. Assuming, without deciding, that a stock broker owes a specific duty to a customer to protect the customer from market declines, the Court of Appeals' statement, of course, would be correct. Here, however, neither the Court of Appeals nor plaintiff points to a source of law to support the proposition that the scope of an accountant's duty to a client similarly encompasses a duty to protect its client from fluctuations in the market, and our discussion of foreseeability and duty suggests that it does not.